UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No.  13 CR 103 |
| v. | ) | |
| | ) | Hon.  Robert W. Gettleman |
| CORNELIUS PAXTON, et al. | ) | |

### GOVERNMENT'S RESPONSE TO
### DEFENDANTS' MOTION FOR DISCOVERY ON
### THE ISSUE OF RACIAL PROFILING/SELECTIVE PROSECUTION

The UNITED STATES OF AMERICA, by its attorney, GARY S. SHAPIRO, United States Attorney for the Northern District of Illinois, hereby responds as follows to Defendants' Motion for Discovery on the Issue of Racial Profiling/Selective Prosecution ("Motion") (Doc. 77) and supporting memorandum ("Mem.") (Doc. 77-1).

### INTRODUCTION

To be entitled to discovery on their selective-prosecution claim, defendants must make a credible showing that there were similarly situated individuals of a different race who could have been prosecuted for the same crimes but were not.  Because defendants do not even attempt to satisfy that threshold requirement, their motion for discovery should be denied.

### BACKGROUND

As the Court is by now well aware, this case arises from a sting operation, in which an undercover agent (the "UC") assumed the identity of a drug courier

who wanted to rob multi-kilogram quantities of cocaine from a stash house purportedly guarded by armed Mexican narcotics traffickers.

*Investigation and Arrest of Defendants*

The undercover portion of the investigation took place from December 5, 2012, when the UC first met with Cornelius Paxton, until the arrest of defendants approximately eight weeks later, on January 30, 2013. Complaint (Doc. 1) ¶¶ 8-66. The UC was introduced to Cornelius Paxton by a confidential informant, who reported that Paxton had expressed interest in participating in the stash house robbery and had claimed to have a robbery crew. *Id.* ¶ 6. Cornelius Paxton, in turn, selected and recruited the other four defendants to participate in the robbery.

Before their final meeting on the night of defendants' arrest, the UC met four times with Cornelius Paxton—on December 5, December 27, January 10, and January 29, 2013. During these meetings, Cornelius Paxton painted a portrait of himself as someone who had a robbery crew, handled firearms, had a history of narcotics trafficking, and was ready and willing to rob a drug stash house:

- Cornelius Paxton repeatedly avowed his readiness and ability to carry out the proposed robbery, notwithstanding the UC's warning that the stash house was protected by armed guards. Complaint ¶ 12 ("We definitely could make it happen."); *id.* ¶ 17 ("What I do, I

    do it for real, man."); *id.* ¶ 19 ("[Y]ou in the right house now."); *id.* ¶ 20 ("I'm down, gentlemen. Ain't nothing now but to do it.").

- Cornelius Paxton said he had a robbery crew consisting of "professional" men. Complaint ¶ 32; *see also* ¶ 47 ("Man, these my people, I don't do nothin' without these guys.").

- He suggested that one of his robbery crew members was a law enforcement officer, or could pose as such using a "badge." *Id.* ¶ 43; *id.* ¶ 28 ("I got some real good guys that work that area. . . . They MEGs [i.e., Metropolitan Enforcement Group members] . . . They double strapped up [armed]. . . . They on the side of the law . . . . How many of 'em you know shoot it out with the police?"); *id.* ¶ 33 (stating that individual was not real law enforcement).

- He asked the UC about installing a hidden compartment in a car, where Cornelius Paxton could conceal a gun. *Id.* ¶ 21 ("[T]his is going to hold a gun.").

- He advised that his crew "got a few thumpers [firearms], you know? A few somethin' that we can conceal." *Id.* ¶ 44.

- Corroborating intelligence from the confidential informant, Cornelius Paxton implied that he sold multi-pound quantities of marijuana, and used to sell cocaine. *Id.* ¶ 16 (proposing to provide an acquaintance with "pounds" of "weed"); *see also* ¶ 28 ("I've been fuckin' with them cats [Mexican drug traffickers] for fuckin' thirty years, twenty years.").

- When asked by the UC whether he had "a way to get rid of that shit" (meaning sell the cocaine from the robbery), Cornelius Paxton replied in the affirmative. *Id.* ¶ 33 ("Yeah, I got a few mother fuckers, man.").

    Cornelius Paxton's January 29, 2013, meeting with the UC took place in the UC's vehicle in a parking lot in Chicago. *See* Complaint ¶¶ 41-47. Toward the end of that meeting, Cornelius Paxton and the UC walked over to another

3

car in the parking lot, in which Cornelius Paxton had arrived. *Id.* ¶ 48. In that car were Randy Walker, Matthew Webster, and Adonis Berry. *Id.* Cornelius Paxton got into the front passenger seat of the car, and the UC leaned into the car through an open rear window and spoke to the car's occupants. *Id.* ¶ 49. The UC remarked, "He told ya? We're expecting at least fifteen in there, and it should be good." *Id.* In the presence of Walk, Webster, and Berry, the UC and Cornelius Paxton also discussed the signal that the UC would use to let the robbery crew know whether there was cocaine in the stash house. *Id.*

The defendants were arrested on January 30, 2013. That evening, Cornelius Paxton, Matthew Webster and Adonis Berry met with the UC at an undercover warehouse in Chicago—supposedly to await a call that would inform them of the stash house's location. During the meeting at the warehouse, the UC showed Cornelius Paxton, Webster and Berry a car with a hidden "trap" compartment that they could use for the robbery. Complaint ¶¶ 52-55. The UC told the three that the drugs at the stash house "aint stepped on [i.e., were pure]" and were "straight from Mexico," and Webster and Berry affirmed their willingness to go through with the robbery. *Id.* ¶ 57. When the UC asked if they wanted to put their firearms ("tools") in the car's trap compartment, Cornelius Paxton turned to Berry; Berry told Cornelius Paxton, "it[']s in the burbon" (a reference, as will be seen momentarily, to a loaded 9 millimeter pistol that would

4

be found minutes later in a Chevrolet Suburban occupied by Walker and Berry). *Id.* ¶ 58. Cornelius Paxton advised the UC that a confederate was at "Lawrences." *Id.* Indeed, during the meeting at the warehouse, Randy Paxton and Randy Walker were waiting nearby at the Lawrence Fisheries restaurant parking lot, in a Chevrolet Suburban. In the rear of the Suburban was a loaded 9 millimeter pistol. *Id.* ¶ 60.

Following their arrest, defendants were transported in a police van to ATF's Chicago field office. Statements made by defendants in the transport van, and by some of the defendants in post-arrest interviews, make clear that their plan was to rob the UC once he had picked up his approximately-three-kilogram cocaine delivery from the stash house, rather than to rob the stash house itself. *See* Complaint ¶¶ 61-66 (summarizing post-arrest statements).[1] In particular, Walker and Berry both admitted during post-arrest interviews that the plan was to rob the UC after the UC picked up what they understood would be a multi-

---

[1] Randy Paxton and Randy Walker, who had been arrested at Lawrence Fisheries, were loaded first into the police transport van. While they were alone in the van together, Randy Paxton remarked, "I shoulda sensed it; I shoulda just left. Two keys [kilograms of cocaine], two fuckin' keys!" Later, while still alone with Walker, Randy Paxton stated, "They can't get us for nothin' without that pistol. Never happened." After Cornelius Paxton, Berry, and Webster had been placed in the van, Cornelius Paxton remarked a number of times that the plan had been to take the UC's "bag" and not to rob the stash house. At one point, when Cornelius Paxton protested that the group hadn't had any weapons, Webster pointed out, "They got his truck"–a reference to the pistol in the Chevrolet Suburban in which Walker and Paxton were sitting at the time of their arrest. (The foregoing is based on a preliminary review of the recording and does not reflect a final transcript.)

kilogram quantity of cocaine. *Id.* ¶¶ 61-63. Both Walker and Berry also admitted being aware that the crew had a firearm. *Id.* ¶¶ 62-63. Webster claimed to believe that the plan was to rob "cush" (marijuana). *Id.* ¶ 65. Cornelius Paxton stated the plan was to steal money only from the UC, and then alert a law enforcement officer whom Cornelius Paxton knew to the presence of the stash house. *Id.* ¶ 66. For his part, Randy Paxton said that he was at Lawrence Fisheries because he was hungry. *Id.* ¶ 64.

### *The Indictment*

On February 28, 2013, a grand jury found probable cause to indict all five defendants on charges of conspiring to possess with intent to distribute more than 500 grams of cocaine, attempting to possess with intent to distribute more than 500 grams of cocaine, conspiracy to commit a Hobbs Act robbery, attempt to commit a Hobbs Act robbery, and possession of a firearm in furtherance of those crimes. Randy Paxton is also charged with being a felon in possession of a firearm.

### *Defendants' Motion*

Defendants have now moved the Court for an order compelling discovery of the myriad items listed in subparagraphs 11(a) through 11(i) of their Motion. Defendants argue that they need this information "to pursue a motion to dismiss and/or defense that [ATF Chicago] is targeting people of color as defendants in

6

a specific kind of crime that they create, i.e. phony stash house ripoff cases like this one, and then the United States Attorney's Office for the Northern District of Illinois . . . is bringing a prosecution based on this sting." Defendants' Motion at 1.

Defendants base their motion on what they describe as the result of their efforts to compile all stash house cases brought in the Northern District of Illinois, Eastern Division, since 2006—a list comprising seventeen charged cases and fifty-seven defendants (including defendants in this case). Motion at 3-6, ¶¶ 2, 5-6. (Defendants add the qualification that they "used only ATF cases to attempt to focus on one investigative agency rather than mix the results among various agencies which may have different methodologies and practices." *Id.* at 3-4, ¶ 4.) According to the information gathered by defendants, the stash house defendants are predominantly African-American: forty-two of the fifty-seven defendants, or roughly seventy-four percent, were African-American, while seven (roughly twelve percent) were white and eight (roughly fourteen percent) were Latino. *Id.* at 5-6, ¶ 6. In the seven of those cases brought since 2011, according to defendants, there have been nineteen African-American defendants, seven Latino defendants, and no white defendants. *Id.*

7

**ARGUMENT**

The standard governing defendants' motion is well-settled: "a defendant who seeks discovery on a claim of selective prosecution must show some evidence of both discriminatory effect and discriminatory intent." *United States v. Bass*, 536 U.S. 862, 863 (2002) (citing *United States v. Armstrong*, 517 U.S. 456, 465 (1996)). Moreover, to satisfy the first prerequisite (evidence of discriminatory effect), "the defendant must make a 'credible showing' that 'similarly situated individuals of a different race were not prosecuted.'" *Bass*, 536 U.S. at 863 (quoting *Armstrong*, 517 U.S. at 465, 470).

The Supreme Court has insisted on a "demanding" standard for selective-prosecution claims precisely because they ask "a court to exercise judicial power over a special province of the Executive":

> The Attorney General and United States Attorneys retain broad discretion to enforce the Nation's criminal laws . . . . As a result, the presumption of regularity supports their prosecutorial decisions and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties. In the ordinary case, so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion.

*Armstrong*, 517 U.S. at 463-64 (internal quotations, alterations and citations omitted).

8

To be sure, "a prosecutor's discretion is subject to constitutional constraints," including equal protection principles. *Armstrong*, 517 U.S. at 464 (internal quotations and citations omitted). But "[i]n order to dispel the presumption that a prosecutor has not violated equal protection, a criminal defendant must present clear evidence to the contrary." *Id.* (internal quotations and citations omitted). Further, "[t]he justifications for a rigorous standard for the elements of a selective-prosecution claim . . . require a correspondingly rigorous standard for discovery in aid of such a claim." *Id.* at 468. This "rigorous standard" is not easily satisfied. In particular, "raw statistics regarding overall charges say nothing about charges brought against *similarly situated defendants*." *Bass*, 536 U.S. at 864 (emphasis in original)."

The defendants in *Armstrong*, for example, supported their discovery motion with a study similar to the information provided by defendants here. The study showed that every defendant in the twenty-four narcotics cases closed in the preceding year by the local Federal Defender's Office was African-American. 517 U.S. at 459. Nevertheless, the Supreme Court held that the *Armstrong* defendants were not entitled to discovery on their selective-prosecution claim:

> "respondents' 'study' did not constitute 'some evidence tending to show the existence of the essential elements of' a selective-prosecution claim. The study failed to identify individuals who were not black and could have been prosecuted for the offenses for which respondents were charged, but were not so prosecuted."

9

*Id.* at 470.[2]

Here, defendants do not even attempt to satisfy *Armstrong*'s threshold requirement to show that "similarly situated individuals of a different race were not prosecuted"—*i.e.,* that there are non-African Americans who "could have been prosecuted for the offenses for which [defendants] were charged, but were not so prosecuted." Rather, defendants attempt to circumvent this requirement altogether: they argue that, given the nature of the sting operation at issue, the pool of similarly situated individuals "is the entire adult white population of the Northern District of Illinois." Defendants' Mem. at 6. For a number of reasons this argument cannot withstand scrutiny.

*First*, to accept defendants' argument would be to eviscerate *Armstrong* and its insistence on a "rigorous standard for discovery in aid of [a selective-prosecution] claim." 517 U.S. at 468. To treat the "entire adult white population

---

[2]*See also Bass*, 536 U.S. at 863-64 (holding that African American defendant in capital case was not entitled to discovery, notwithstanding nationwide statistics demonstrating that United States charges African Americans with death-eligible offense more than twice as often as it charges whites, where defendant "failed to submit relevant evidence that similarly situated persons were treated differently"); *United States v. Barlow*, 310 F.3d 1007, 1010 (7th Cir. 2002) (to obtain discovery on claim that DEA agents selectively enforced law by approaching, interviewing and searching African Americans but not Caucasians, defendant "was required to present evidence that DEA agents chose *not* to approach whites to whom he was similarly situated"); *United States v. Hayes*, 236 F.3d 891 (7th Cir. 2001) ("Absent some evidence of different treatment for similarly-situated individuals of other races, Hayes is engaged in the type of fishing expedition rejected by the Supreme Court and this court.").

10

of the Northern District of Illinois" as "similarly situated" to defendants would obviously render the "similarly situated" requirement meaningless.

*Second*, defendants' argument that they are "similarly situated" to the "entire adult white population of the Northern District of Illinois" ignores the entirety of their conduct described above, both before and immediately after their arrest following a multi-week investigation, especially the conduct and statements of Cornelius Paxton—the person who selected and recruited the other four defendants to participate in the robbery.

*Third*, defendants' own submission belies any claim that "similarly situated individuals of a different race were not prosecuted." As characterized by defendants, their survey shows that roughly thirty percent of the stash house cases investigated by ATF and prosecuted in this district since 2006 involved non-African-American defendants. Defendants' Motion at 5-6, ¶ 6 (stating that 12 of 17 cases "target[ed] all African Americans"). Even limiting the comparison to white defendants, seven, or roughly twelve percent, of the fifty-seven defendants identified in defendants' sample were white. Defendants' evidence demonstrates that non-African Americans are investigated and prosecuted for the crimes with which defendants are charged. The figures are less compelling and probative than were the numbers cited in *Armstrong*, where there were no non-African American defendants. In any event, as noted, defendants'

11

submission does not even attempt to demonstrate that similarly situated non-African Americans could have been but were not prosecuted for the crimes charged in this case.

In short, because defendants fail to satisfy *Armstrong*'s threshold requirement that they show discriminatory effect by coming forward with credible evidence that similarly situated individuals of other races were not prosecuted for the same crimes, their motion for discovery should be denied.[3]

---

[3] Because defendants do not meet *Armstrong*'s discriminatory-effect requirement, the Court need not reach the discriminatory-intent requirement. It bears noting, however, that defendants have also failed to show discriminatory intent. Defendants argue that "the U.S. Attorney's Office has an obligation to ensure that its prosecutions are not targeting persons on the basis of their race." Defendants' Mem. at 8. This argument again ignores defendants' evidence that a significant percentage of stash house defendants are not African American. At bottom, defendants' discriminatory-intent argument hinges on the same inadequate showing on which they base their discriminatory-effect argument.

## CONCLUSION

For the foregoing reasons, the government respectfully requests that the Court deny Defendants' Motion for Discovery on the Issue of Racial Profiling/Selective Prosecution.

Dated: July 24, 2013

                                              Respectfully submitted,

                                              GARY S. SHAPIRO
                                            United States Attorney

By:   /s/ Dylan Smith
        DYLAN SMITH
        Assistant United States Attorney
        219 South Dearborn Street, 5th Floor
        Chicago, Illinois 60604
        (312) 469-6305